IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

**YEVETTE WILSHIRE, individually
and in her capacity as administratrix
of the Estate of JEREMY RINEHART,
Deceased,**

       **Plaintiff,**

v.                                                           Case No.:  3:14-cv-08374
                                                                 (Consolidated with 2:12-cv-00622)

**BRIAN S. LOVE, M.D., and
UNITED STATES OF AMERICA,**

       **Defendants.**

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is the Motion for Protective Order or, in the Alternative, Motion to Quash Subpoenas for Education and Pharmacy Records filed by Brian S. Love, M.D. (ECF No. 47). Defendant Love filed a memorandum in support of the motion, (ECF No. 48), and Plaintiff filed a responsive brief in opposition. (ECF No. 54). Plaintiff also filed a Motion and Memorandum of Law in Support of Motion to File Exhibit Under Seal, (ECF No. 55), which the Court **GRANTS** for the reasons set forth in the motion. The defendant has now filed a reply memorandum. (ECF No. 57). The positions of the parties are clear; thus, the undersigned does not find oral argument necessary prior to ruling.

For the reasons that follow, the Court **GRANTS** the defendant's Motion for a Protective Order and to quash the subpoena for education records. With respect to the

1

defendant's pharmacy records, in view of the plaintiff's representation that she does not intend to seek the defendant's pharmacy records at this time, that portion of the motion is **DENIED** as moot. (*See* ECF No. 54 at 1). However, defendant is granted leave to re-file the motion should the need arise.

I. **Relevant Facts**

In this medical malpractice action, Plaintiff Yevette Wilshire ("Wilshire") complains about care rendered to her son, Jeremy Rinehart, in the Emergency Department at Plateau Medical Center on August 22, 2009. In regard to Defendant Brian S. Love, M.D. ("Love"), Wilshire alleges that Love deviated from accepted standards of care when he failed to properly treat her son's acute cocaine intoxication and prematurely discharged him from the hospital, allowing him to suffer a cardiac arrest that led to his death four days later. In the course of discovery, Wilshire served interrogatories upon Love asking, in relevant part, for his detailed educational history, including the places where he had been educated, the degrees he had obtained, and the dates on which he had obtained the degrees. In response, Love provided a curriculum vitae. (ECF No. 54-3).

The curriculum vitae indicates that Love attended Marshall University School of Medicine from August 1993 through May 2003. (*Id.* at 1). It next reflects that Love completed a one-year internship at West Virginia University Hospital from July 2004 through July 2005. (*Id.*). Between these two entries, the curriculum vitae states: "Time Gap due to Motor Vehicle Accident." (*Id.*). Apparently because of its location on the curriculum vitae, Wilshire interpreted this phrase as Love's explanation for why he spent ten years in medical school, completing a program that normally takes four years to finish. (ECF No. 54 at 3). Wilshire deposed Love after receiving the curriculum vitae,

2

but Wilshire did not ask any questions regarding Love's ten-year stint in medical school, or the implications of the phrase "Time Gap due to Motor Vehicle Accident." (*See* ECF No. 57 at 3, 57-1).

Wilshire recently notified Love that she intended to serve a subpoena upon the Dean of the Marshall University School of Medicine to produce Love's education records from that institution. Love immediately objected to the subpoena on the basis that his medical school records were irrelevant to the claims and defenses in the instant action and were protected from discovery by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g. The parties met and conferred, but were unable to resolve their differences. Accordingly, Wilshire served the subpoena, and Love filed the Motion for Protective Order and to Quash. Since that time, the parties have conferred again, and Wilshire is willing to limit the scope of the subpoena "to information and records which are germane to the reasons at [sic] to why it took Love ten (10) years to complete his medical education." (ECF No. 54 at 2).

## II. Positions of the Parties

Wilshire claims that Love's medical school records are relevant for two essential reasons. First, they are evidence of Love's credentials. (ECF No. 54 at 4). According to Wilshire, while medical school records are not important in every medical negligence case, in this case they are significant because of the extraordinary amount of time it took Love to finish a four-year curriculum. Wilshire adds that she should be permitted to discover the reason for the lengthy delay not only because the quality of Love's care is at issue, but also because Love intends to give "expert opinions" in this case.

Second, Wilshire argues that the records are highly relevant to Love's credibility. Wilshire indicates that she has good reason to believe that Love's explanation for his

3

protracted education (i.e. a motor vehicle accident) is a misrepresentation of the facts. (*Id.* at 5). If Love falsified an answer to a discovery request, Wilshire maintains that the jury has a right to know the circumstances; particularly, as there is already evidence in the record suggestive of Love's lack of candor. Wilshire alleges that Love added self-serving late notes to Jeremy Rinehart's medical chart after Love learned of Rinehart's cardiac arrest. (*Id.* at 7). Wilshire points out that the credibility of a pivotal witness is always a matter "open for discovery in most civil proceedings." (*Id.* at 5) (citing *Keeney v. Charnock,* 2006 U.S.Dist. LEXIS 17468, at 3 (S.D.W.Va. Apr 5. 2006)).

Conversely, Love bases his motion to quash and for protective order on three grounds. First, he disagrees that his medical school records are relevant, arguing that records reflecting his performance or level of success in school between 1993 and 2003 are not likely to lead to admissible evidence as to whether he met the standard of care on August 22, 2009. In Love's view, the plaintiff has not made any showing to support her broad request for information, nor has she articulated any rational argument for how evidence from the medical school will make it more or less likely that Love appropriately treated Jeremy Rinehart. (ECF No. 48 at 5-6).

Second, Love takes issue with the factual predicate underlying Wilshire's credibility argument. (ECF No. 57 at 3). Rather than providing an explanation for the ten years spent in medical school, Love explains that the phrase "Time Gap due to Motor Vehicle Accident" relates to the one-year gap between his graduation from medical school and the beginning of his internship. Indeed, when examining the curriculum vitae, the ten-year period Love spent at Marshall's medical school does appear as a time span, while the "gap" seems to be the time between May 2003 and July 2004. (ECF No. 54-3 at 1). Furthermore, Love contends that there is no other basis in the record upon

4

which to question his credibility. (ECF No. 57 at 5). He addresses Wilshire's allegations that he added late notes to the chart, acknowledging that he testified at his deposition that he may have late-charted. However, contrary to Wilshire's attempt to cast him in a negative light, Love argues that this testimony actually demonstrates his propensity for truthfulness.

Finally, Love argues that education records are recognized as private under FERPA and, consequently, they should be protected from unnecessary disclosure. He cites to a series of cases holding that a party seeking to discover education records has a "significantly heavier burden" than exists with respect to discovery of other kinds of information and must show that "its interest in obtaining the records outweighs the significant privacy interests of the students." (ECF No. 48 at 6) (citing *Alig-Mielcarek v. Jackson,* 286 F.R.D. 521, 526 (N.D.Ga. 2012)).

### III. <u>Federal Rules 26 and 45</u>

Federal Rule of Civil Procedure 26(b)(1) provides that:

> Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter ... Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

While the intended focus of discovery is the claims and defenses involved in the action, depending upon the particular needs of the case, broader discovery is permissible. Fed. R. Civ. P. 26(b)(1), advisory committee notes (2000). In many cases, "the general subject matter of the litigation governs the scope of relevant information for discovery purposes," *Kidwiler v. Progressive Paloverde Ins. Co.,* 192 F.R.D. 193, 199 (N.D.W.Va. 2000) (internal citations omitted), and discovery seeking information with which to

impeach the credibility of a witness is commonly allowed. *Behler v. Hanlon*, 199 F.R.D. 553, 555-56 (D.Md., 2001). "Information showing that a person having knowledge of discoverable facts may not be worthy of belief is always relevant to the subject matter of the action." 8 Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus, *Federal Practice and Procedure,* § 2015 (3d ed.2010); *see, also, Cobell v. Norton,* 213 F.R.D. 16, 25 (D.D.C. 2003) (holding that discovery on whether factual misrepresentations were made is directly relevant to witness credibility). The party resisting discovery, not the party seeking discovery, bears the burden of persuasion. *See Kinetic Concepts, Inc. v. ConvaTec Inc.,* 268 F.R.D. 226, 243–44 (M.D.N.C. 2010)(citing *Wagner v. St. Paul Fire & Marine Ins. Co.,* 238 F.R.D. 418, 424–25 (N.D.W.Va. 2006)).

Simply because information is discoverable under Rule 26, however, "does not mean that discovery must be had." *Schaaf v. SmithKline Beecham Corp.*, 233 F.R.D. 451, 453 (E.D.N.C. 2005) (citing *Nicholas v. Wyndham Int'l, Inc.,* 373 F.3d 537, 543 (4th Cir. 2004)). For good cause shown under Rule 26(c), the court may restrict or prohibit discovery that seeks relevant information when necessary to protect a person or party from annoyance, embarrassment, oppression, or undue burden or expense. Fed. R. Civ. P. 26(c). In addition, Rule 26(b)(2)(C) requires the court, on motion or on its own, to limit the frequency and extent of discovery, when (1) "the discovery sought is unreasonably cumulative or duplicative;" (2) the discovery "can be obtained from some other source that is more convenient, less burdensome, or less expensive;" (3) "the party seeking the discovery has already had ample opportunity to collect the requested information by discovery in the action;" or (4) "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action,

and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii). This rule "cautions that all permissible discovery must be measured against the yardstick of proportionality." *Lynn v. Monarch Recovery Management, Inc.*, 285 F.R.D. 350, 355 (D. Md. 2012) (quoting *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 523 (D. Md. 2010)). To insure that discovery is sufficient, yet reasonable, district courts have "substantial latitude to fashion protective orders." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984).

Federal Rule of Civil Procedure 45(d) sets forth the protections available to a person subject to or affected by a subpoena. In particular, Rule 45(d)(3) outlines when a court *must* quash or modify a subpoena, when it *may* do so, and when the court may direct compliance under specified conditions. As a general rule, "only the party or person to whom the subpoena is directed has standing to move to quash or otherwise object to a subpoena." *Transcor, Inc. v. Furney Charters, Inc.*, 212 F.R.D. 588, 590 (D.Kan. 2003) (citation omitted). However, an exception exists when the person objecting has a personal right or privilege in the information sought by the requester. *Singletary v. Sterling Transport Company, Inc.*, 289 F.R.D. 237, 239 (E.D.Va. 2012). Although the subpoena in this case is directed to the Dean of the Marshall University School of Medicine, the Court finds as a preliminary matter that Love has the requisite standing to move for its quashal. Clearly, Love has a personal right in the confidential information contained in his education records, and thus a corresponding right to move to quash a subpoena *duces tecum* seeking those records.

In the context of discovery, "Rule 45 adopts the standards codified in Rule 26 which allows for the discovery of any matter 'not privileged, that is relevant to the claim or defense of any party' when the discovery request 'appears reasonably calculated to

lead to the discovery of admissible evidence.'" *Schaaf v. SmithKline Beecham Corp.*, 233 F.R.D. 451, 453 (E.D.N.C. 2005). Thus, the same limitations to discovery requests found in Rule 26 should be applied to a subpoena served pursuant to Rule 45. *See, e.g., HDSherer LLC v. Natural Molecular Testing Corp,* 292 F.R.D. 305, 308 (D.S.C. 2013) ("Rule 45 does not list irrelevance or overbreadth as reasons for quashing a subpoena. However, the scope of discovery allowed under a subpoena is the same as the scope of discovery allowed under Rule 26.") (citing *Cook v. Howard,* 484 Fed.Appx. 805, 812 (4th Cir. Aug. 24, 2012) ("Although Rule 45(c) sets forth additional grounds on which a subpoena against a third party may be quashed[,] ... those factors are co-extensive with the general rules governing all discovery that are set forth in Rule 26.")). Accordingly, in this case, the Court shall consider Love's motion to quash under the standards set forth in Federal Rule of Civil Procedure 26 and may fashion a protective order quashing or modifying the subpoena to the extent that it seeks discovery which is irrelevant, overly broad, annoying, embarrassing, oppressive, unduly burdensome or expensive, unreasonably cumulative, or duplicative.

## IV. Discussion

Wilshire argues that Love's education information is neither privileged, nor entitled to special treatment. Relying on the decision in *Maggard v. Essar Global Ltd.*, Wilshire disagrees that the burden is on her to establish a greater need for Love's records than would normally be required. She asserts that, like any other case, once she demonstrates the relevancy of the information she seeks, the burden shifts to Love to show cause why discovery of that information should be limited or prohibited. *Maggard,* No. 2:12cv00031, 2013 WL 6158403, at *7 (W.D.Va. Nov. 7, 2013). Wilshire maintains that Love cannot meet this burden because the issues of competence and

8

credibility are extremely relevant. In addition, precautions can be taken to limit or prevent re-disclosure of Love's medical school records without denying their legitimate use in this case.

The undersigned does not entirely agree. Through FERPA, Congress explicitly recognized a student's privacy right in the information contained in his or her education records and clearly intended for those records to be treated with special care. *United States v. Miami University,* 91 F.Supp.2d 1132, 1159 (S.D.Ohio 2000). While that privacy right may not necessarily translate into a heavier burden on a civil litigant to establish a special need for education records before they can be discovered, the privacy right certainly is an important factor to consider in assessing good cause under Rule 26(c) and in conducting a proportionality analysis under Rule 26(b)(2)(C).

Looking first at Wilshire's contention that she needs the records to investigate Love's credentials, the Court finds this position unpersuasive. As Love emphasizes, Wilshire spent an entire day deposing Love, yet made no effort to explore the reasons why it took him so long to complete medical school. (*See* ECF No. 57-1). Wilshire asked many other questions during the deposition pertaining to Love's qualifications, experience, and training, but apparently did not find the ten-year stretch in medical school to be particularly important. Under the proportionality analysis, Wilshire has already had ample opportunity to obtain a thorough explanation of the circumstances surrounding Love's medical school experience from Love, who is undoubtedly the best, least expensive, and most convenient source of information on the subject. Asking Love the pertinent questions likely would have obviated the need to invade the privacy of his education records. Furthermore, the burden of this discovery outweighs the expected benefit. On the burden side, there is the invasion of Love's privacy, the expense of the

9

deposition, the expense and inconvenience to the medical school and its Dean, and the anticipated time and expense of motions that are to likely follow disclosure of the records. On the flipside, Wilshire may confirm that Love was not a particularly brilliant or ambitious medical student, which is, at very best, marginally relevant to the case and likely more prejudicial than probative of the central issues. In any event, that conclusion could be inferred solely from the length of time it took Love, when compared to his peers, to finish medical school. Moreover, even if Love was a poor medical student, he completed an internship and residency thereafter, and was a licensed and practicing Emergency Department physician six year later when the alleged malpractice occurred.[1]

Wilshire's second argument, that the records are central to the question of Love's credibility, is equally faulty. Wilshire believes that the records will provide a basis for impeachment by demonstrating that Love was untruthful when he said that a motor vehicle accident delayed his completion of medical school. The problem, however, is that Love apparently never made that statement. Instead, the foundation for impeachment is based upon a misinterpretation of Love's curriculum vitae. Again, this issue could have been clarified during Love's deposition, which would have been more convenient, less burdensome, and less expensive than collecting his education records, and, as previously stated, Wilshire had ample opportunity to obtain this information.

Finally, even if Wilshire could demonstrate a more pressing need for the records than she has shown, the prospect certainly exists that there are no records available at Marshall University that would adequately convey *all relevant facts* regarding why Love took ten years to finish medical school. In that case, the records could actually serve to

---

[1] Although Wilshire argues that Love is an expert, it appears from what was presented to the undersigned that Love's expert testimony is limited to rendering an opinion that he feels he met the standard of care and did not injure the plaintiff's decedent; not that he has special expertise, training, or credentials in any particular aspect of the case.

complicate and obscure, rather than simplify and illuminate, the issue. At this point in the litigation, when discovery is closed and dispositive motions are due, it is too late in the process to open matters that should have been resolved months, even years, ago.[2] Moreover, the records potentially could contain highly personal, highly sensitive, or embarrassing information that would never have been requested and disclosed if Wilshire had explored the topic at deposition or through other, less intrusive methods of discovery.

## V. Conclusion

Wherefore, the Court finds good cause to **GRANT** the Motion for Protective Order or, in the Alternative, Motion to Quash Subpoenas for Education Records filed by Brian S. Love, M.D. (ECF No. 47).

The Clerk is instructed to provide a copy of this Order to counsel of record.

**ENTERED**: March 31, 2015

Cheryl A. Eifert
United States Magistrate Judge

---

[2] While the instant action was removed to this Court in 2014, the medical negligence action against Love was instituted in 2011. Love served Wilshire with the curriculum vitae on February 8, 2012, and Love's deposition was taken in December 2012. It appears that the first time Wilshire showed an interest in Love's education records was February 12, 2015.